J-S12001-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.B.A.-R.A., A MINON | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.B., MOTHER | : : : : : : : : : | |
| | : | No. 3203 EDA 2019 |

Appeal from the Decree Entered October 15, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000720-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: A.A., ALSO KNOWN AS A.B.A.-R.A., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.B., MOTHER | : : : : : | |
| | : | No. 3204 EDA 2019 |

Appeal from the Order Entered October 15, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000527-2013

BEFORE:   SHOGAN, J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY SHOGAN, J.:                    **FILED MAY 01, 2020**

A.B. ("Mother") appeals from decree entered on October 15, 2019, in

the Court of Common Pleas of Philadelphia County involuntarily terminating

her parental rights to her nine-year-old daughter, A.B.A.-R.A. ("Child"), born

_____

[*] Retired Senior Judge assigned to the Superior Court.

in August of 2010.[1]  In addition, Mother appeals from the permanency-review order entered on October 15, 2019.  Upon review, we affirm the involuntary termination decree and quash Mother's appeal from the interlocutory permanency-review order.

On September 27, 2019, the Philadelphia Department of Human Services ("DHS") filed a petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).  In addition, DHS filed a petition to change Child's permanency goal from reunification to adoption.  The trial court held a hearing on the involuntary termination petition on October 15, 2019, when Child was nine years old.[2]  By order the same date, the court scheduled a hearing on the goal change petition for November 21, 2019.[3]

_____

[1] By separate decree entered on October 15, 2019, the trial court involuntarily terminated the parental rights of any unknown father.  With respect to C.A. ("Father"), the court terminated his parental rights by decree dated and entered on November 21, 2019, based on his voluntary relinquishment. Neither Father nor any unknown father filed a notice of appeal.

[2] During the hearing, Jason Kleinman, Esquire, served as Child's counsel, and James Martin, Esquire, served as Child's guardian *ad litem* ("GAL").  Attorney Kleinman stated on the record and in open court that Child "does not want any contact with her mother.  However, in the future, she's open to that changing if [M]other changes the way that she behaves . . . ." N.T., 10/15/19, at 73.

[3] At the conclusion of the evidence on October 15, 2019, the trial court stated on the record, "[W]e're waiting for [F]ather's voluntary relinquishment to vest . . . . [I]f the voluntary relinquishment vests, I'll then be in a position to change the goal to adoption.  I'm not able to now."  N.T., 10/15/19, at 82.

DHS presented the testimony of Tamika Palmer, the Community Umbrella Agency ("CUA") worker, and Morgan Webb, a trauma therapist at Children's Crisis Treatment Center ("CCTC"), where Child began receiving therapy in September of 2017. In addition, the trial court admitted four DHS exhibits, which included, *inter alia*, copies of Child's dependency docket and Mother's criminal record. N.T., 10/15/19, at 6–8; DHS Exhibits 1–4. The GAL presented Mother's testimony *via* telephone from Riverside Correctional Facility.

The testimonial and documentary evidence revealed that DHS first became involved with this family in 2012 as a result of the sexual assault of Child's older sister ("Sister") by Sister's "bio[logical] brother" while in Mother's custody. N.T., 10/15/19, at 9, 25, 29. In April of 2013, the trial court adjudicated Child dependent. Order, 4/25/13. In April of 2014, Child's dependency was discharged, and the trial court awarded Father custody of

---

The trial court recognized that Father executed a consent to adopt on September 23, 2019, and that DHS had filed a petition to confirm consent pursuant to 23 Pa.C.S. § 2504 (Alternative procedure for relinquishment). Section 2504 requires that a court "hold a hearing for the purpose of confirming a consent to an adoption upon expiration of the time periods under section 2711 (relating to consents necessary to adoption)." 23 Pa.C.S. § 2504(a). Section 2711 provides, "For a consent to an adoption executed by a birth father or a putative father, the consent is irrevocable more than 30 days after the birth of the child or the execution of the consent, whichever occurs later." 23 Pa.C.S. § 2711(c)(1)(i). Thus, at the time of the termination hearing on October 15, 2019, the expiration of the period for Father's consent had not occurred.

Child.  *Id.* at 9–10.  While Child was in Father's custody, Sister, who as best we can discern from the record also resided in Father's custody, was again sexually assaulted, this time "by her stepbrother."[4]  *Id.* at 10.  The trial court removed Child from Father's custody and adjudicated her dependent on October 22, 2015.[5]

Child's permanency goal was reunification, and Mother was required to comply, *inter alia*, with the following requirements in furtherance of that goal: participate in mental health treatment; participate in Child's therapy at CCTC; attend visitation with Child; maintain safe and stable housing; and complete a parenting capacity evaluation.  N.T., 10/15/19, at 10.  Mother failed to comply successfully with every permanency objective.  *Id.* at 26, 36–37.

With respect to visitation with Child, DHS provided Mother biweekly supervised visits and biweekly unsupervised visits on an alternating basis.  *Id.* at 17.  By order dated April 23, 2019, the trial court suspended all of Mother's visits because of the negative effect they were having on Child; the order remained in effect at the time of the subject proceeding.  *Id.* at 16–17.  The trial court had suspended Mother's visits previously in May of 2016, and

_____

[4]  The record is unclear whether this assault was by Sister's stepbrother or Child's stepbrother, or the stepbrother of both.  N.T., 10/15/19, at 10.

[5] We glean from the record that Sister also was a dependent child.  N.T., 10/15/19, at 17.  Sister is not a subject of this appeal.

- 4 -

reinstated them in the form of therapeutic visits in September of 2016, for a period unspecified in the record. *Id.* at 20–21.

Mother pled guilty to criminal charges of aggravated assault, unlawful restraint, serious bodily injury, and possession of an instrument of crime in relation to her assault of her paramour. N.T., 10/15/19, at 12–13. On June 21, 2019, Mother was sentenced to a term of incarceration of eight to twenty-three months. *Id.* at 12; DHS Exh. 3. Mother's minimum release date was March of 2020, and her maximum release date is June of 2021. *Id.* at 14.

Following the evidentiary hearing, by decree entered on October 15, 2019, the trial court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). Also on that date, the court entered a permanency review order that maintained the goal of reunification and Child's placement in kinship care with her paternal great aunt, with whom Sister also resided. On November 12, 2019, Mother timely filed separate notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[6] The trial court filed its Rule 1925(a) opinion on December 10, 2019.

On appeal, Mother presents the following issues for our review:

> 1. Did the court below err in finding that grounds for termination of parental rights had been proven by "clear and convincing evidence"?

---

[6] This Court consolidated Mother's appeals *sua sponte* on January 13, 2020.

2. Did the court below err in finding that [DHS] had met its burden in proving grounds under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8)?

3. Did the court below err in finding that DHS had met its burden to prove that termination would be in [C]hild's best interests, under § 2511(b)?

4. Did the court below err when it found that DHS by clear and convincing evidence had met its burden to change [C]hild's goal to adoption?

Mother's Brief at 4.[7]

We review Mother's issues according to the following standard.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because

_____

[7] With respect to Mother's fourth issue, the October 15, 2019 permanency review order did not change Child's permanency goal, as discussed above. The record reveals that the court changed Child's goal by order dated and entered on November 21, 2019, but Mother did not file a notice of appeal from this order. The October 15, 2019 permanency order does not constitute a final order under Pa.R.A.P. 341 or a collateral order under Pa.R.A.P. 313. Thus, we quash Mother's appeal at 3204 EDA 2019.

Even if we did not quash Mother's appeal from the October 15, 2019 permanency order, we would conclude that she waived her fourth issue by failing to include it in her concise statement of errors complained of on appeal. *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2006) (concluding that the appellant waived a challenge to Section 2511(b) by not including a claim in her concise statement); *see also Krebs v. United Refining Co. of Pa.*, 893 A.2d 776, 797 (Pa. Super. 2006) (citations omitted) (stating, "[A]ny issue not raised in a statement of matters complained of on appeal is deemed waived.").

the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We must agree with the trial court as to only one subsection of 2511(a), as well as Section 2511(b), in order to affirm. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this case, we conclude that the certified record supports the decree pursuant to Section 2511(a)(2) and (b),[8] which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

_____

[8] Based on this disposition, we need not consider Mother's arguments with respect to Sections 2511(a)(1), (5), and (8).

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).

This Court has explained that the moving party must produce clear and convincing evidence with respect to the following elements to terminate parental rights pursuant to Section 2511(a)(2): (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Pursuant to Section 2511(a)(2), parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* Further, the grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity that cannot be remedied are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *Id.* at 337.

With respect to Section 2511(b), this Court has stated that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762–763 (Pa. Super. 2008) (citation omitted).

In this appeal, Mother argues that DHS did not prove by clear and convincing evidence that her conduct warranted termination pursuant to Section 2511(a)(2). Mother's Brief at 12. Specifically, Mother argues that she made progress with her permanency objectives. *Id.* at 13. The record belies Mother's claim.

The trial court stated as follows on the record at the conclusion of the termination hearing:

> [C]hild has never been [in] [M]other's care since 2012, having been first removed and placed with [F]ather, then brought back into the system and placed with a caretaker – not placed with [M]other – for seven years.
>
> And the basis for . . . those decisions throughout the years has been [M]other's failure to complete any of the goals that were outlined for her; significantly, mental health issues, housing issues.
>
> * * *
>
> And her criminal guilty plea brings us to another issue, and that is [M]other's uncontrolled and dangerous behavior throughout the life of this case, and it finally culminated in a serious felony charge against [M]other for the perpetration of crimes against her then-partner.
>
> * * *
>
> [M]other could not keep [C]hild safe. She has failed to put herself in a position to parent [C]hild, to keep [C]hild safe in any way, and she could not be counted on remedying these issues, since she's had almost seven years to do something about the issues that brought [C]hild into care, and has done virtually nothing.

N.T., 10/15/19, at 76–78.

Our review supports the court's findings. Tamika Palmer, the CUA caseworker, testified that Mother's permanency objectives remained the same throughout the underlying matter. N.T., 10/15/19, at 26. Ms. Palmer acknowledged that there were many court orders directing Mother to comply with services in an effort to satisfy her objectives. *Id.* at 26. She testified that Mother failed to comply successfully with all of her objectives. *Id.* at 15–24, 26, 30–32, 35–36, 42, 44–45.

Ms. Palmer explained that Mother's most important objective related to her mental health because "[M]other . . . had her own mental health issue, which includes sexual abuse, as well, and she failed to address it." N.T., 10/15/19, at 22. Ms. Palmer testified that Mother inconsistently attended mental-health treatment during a time unspecified in the record, but she never successfully completed her treatment. *Id.* at 24, 43. Ms. Palmer underscored that Mother demonstrated her poor mental health in visits with Child, in her July of 2019 criminal convictions, and in her inability to recognize that Sister had been sexually assaulted, discussed *infra*.

With respect to Mother's visits with Child prior to April 23, 2019,[9] Ms. Palmer testified that the visits were concerning because "[M]other was having a negative impact on [C]hild, making her . . . emotionally and physically unstable, and [she was] also driving a wedge between [Child] and [Sister]."

---

[9] As best we can discern from the record, Mother visited simultaneously with Child and Sister N.T., 10/15/19, at 39–40.

N.T., 10/15/19, at 17. Ms. Palmer explained on cross-examination by Child's counsel that Mother discussed inappropriate subjects with Child such as sexually transmitted diseases, and she made promises to Child and Sister that they would return home. *Id.* at 39–40. With respect to her attempt to drive a wedge between Child and Sister, Ms. Palmer stated that Mother did this because she was upset that Sister's permanency goal was changed.[10] *Id.* at 17-18. Ms. Palmer testified that Mother attempted to emotionally divide the children by discussing Mother's and Sister's relationship with Child and by telling Child that Mother "didn't want to have contact with [Sister] . . . ." *Id.* at 41.

Ms. Palmer testified that the trial court suspended Mother's visits with Child on April 23, 2019, in part, because Mother failed to participate in mental health treatment. N.T., 10/15/19, at 23. Ms. Palmer confirmed on direct examination that if Mother re-engaged in mental health treatment, Mother's visits with Child could have been reinstated. *Id.* Further, she testified if the court denied DHS's involuntary-termination petition, Mother's visits would remain suspended "[b]ecause [M]other still failed to address her mental health." *Id.* at 32.

Ms. Palmer also testified on direct examination that Mother's 2019 criminal convictions caused concern for Mother's mental health, as follows.

---

[10] Ms. Palmer acknowledged that prior to April 23, 2019, Sister's goal was changed to permanent legal custody pursuant to 42 Pa.C.S. § 6351(a)(2.1).

Q. [W]hen [M]other was incarcerated as of July 2019, you found out about the guilty plea to aggravated assault, correct?

A. Yes.

Q. Are [M]other's criminal charges and conviction[s] a concern for you as to her mental health?

A. Yes.

Q. And why are they a concern?

A. Because it shows that [M]other is unable to control her own behaviors, and also has her own mental health issues.

N.T., 10/15/19, at 23-24.

Finally, Ms. Palmer testified with respect to whether Mother accepted that Sister had been sexually assaulted, as follows:

Q. Did you have ongoing issues with [M]other's ability to recognize that [Sister] had been sexually assaulted?

A. Yes.

N.T., 10/15/19, at 25. Ms. Palmer explained on cross-examination by the GAL that Child would not be safe in Mother's care due to Mother "not being able to address her mental health, not being able to even accept what has happened to [Sister] . . . while in her care." *Id.* at 38.

Ms. Palmer's testimony demonstrates that Mother's repeated and continued incapacity continuing since 2012 has caused Child to be without essential parental care, control, or subsistence necessary for her physical or mental well-being. In addition, Ms. Palmer's testimony supports the court's

finding that the causes of Mother's incapacity cannot or will not be remedied. Thus, we affirm the decree pursuant to Section 2511(a)(2).

With respect to Section 2511(b), Mother argues, "[T]here was insufficient evidence that the bond between [C]hild and [M]other has been broken." Mother's Brief at 16. Mother also asserts that DHS did not satisfy its burden of proving Child would not suffer irreparable harm if Mother's parental rights were involuntarily terminated. We disagree.

This Court has emphasized:

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)). In addition, our Supreme Court has stated that "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. Moreover, this Court directed that in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking

clock of childhood ever in mind." *Id*. at 269. The *T.S.M.* Court observed, "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*.

Ms. Palmer testified that Mother's visits had a negative emotional impact on Child at the time the court suspended them in April of 2019. N.T., 10/15/19, at 19. Ms. Palmer noted that Child has been "doing well" since the visits were suspended. *Id.* at 21. Specifically, she testified on cross-examination by the GAL:

> Q. And what have been your observations of [C]hild's behavior since the suspen[sion] of visits with [Mother]?
>
> A. [Child is] more stable, again, in regards to . . . her behaviors at school, at home. She's not crying and having those meltdowns.

*Id.* at 33. Ms. Palmer explained that Child has not recently spoken about Mother, and she has not asked to see Mother. *Id.* at 26–27, 41. Ms. Palmer testified that there is no parent-child bond between Mother and Child, and that Child would not suffer irreparable harm if the court terminates Mother's parental rights. *Id.* at 28.

In contrast, Ms. Palmer indicated that Child is "very bonded with her great aunt," her pre-adoptive kinship resource. N.T., 10/15/19, at 27–28. Ms. Palmer testified on direct examination:

> Q. Does she look to her great aunt to meet all of her needs?
>
> A. Yes.

- 15 -

> Q. And when you say all of the needs, do you include her emotional needs with that?
>
> A. Yes.
>
> * * *
>
> Q. And does [Child] express to you that she feels she can rely on her aunt?
>
> A. Yes.

*Id.* at 27–28. Ms. Palmer testified that Child wants to stay in the kinship home, where, as stated *supra*, Sister also resides, and with whom she also shares a bond. *Id.* at 29.

Morgan Webb, Child's trauma therapist at CCTC since March of 2019,[11] testified that, prior to the court suspending Mother's visits, Child became "emotional in my office when discussing her visitation with [M]other and some of the concerns that have come up during visitation in the past." N.T., 10/15/19, at 55. With respect to the effect that suspending Mother's visits has had on Child, Ms. Webb testified on direct examination as follows:

> Q. [H]ow would you describe [Child's] behavior since [M]other's visitation was suspended, or her progress in therapy?
>
> A. [Child] continues to make progress in treatment. She has made significant progress since visitation was suspended in April of 2019, and [Child's] symptoms appear to be stabilizing over

_____

[11] Ms. Webb testified that Child was referred to CCTC in September of 2017 "due to experiences of trauma, including history of multiple foster care placements, suspected physical abuse while in foster care, and also exposure to her sister's traumatic experiences, including the sexual abuse . . . ." N.T., 10/15/19, at 47–48.

time. Her symptoms have definitely decreased since April of
2019.

*Id.* at 49-50. Indeed, Ms. Webb explained on cross-examination by Child's

counsel that Child has reached a stable point in her recovery, as follows.

Q. Why do you think she's doing better now?

A. [Child] appears to have a better understanding of her
permanency. So, prior to visitation being suspended, she
expressed a lot of confusion around visitation.

There was a lot of tension between her relationship with her
sister, and also with her father. . . . And, so, since visitation has
been suspended, you see [Child] present as much more calm and
regulated when discussing her family relationships.

She's been able to directly process a lot of her trauma
memories, which is . . . a significant part of her treatment. So, to
see her being able to complete that goal suggests to me that she
is at a stable point in her recovery.

*Id.* at 55–56. In addition, Ms. Webb explained, "At this point in [Child's]

treatment, she appears to understand and be very accepting of [M]other's

limitations. She . . . appears to understand the safety concerns related to

[M]other . . . as well as [M]other's mental health issues." *Id.* at 49. As such,

Ms. Webb testified that Child "has accepted that she doesn't have visitation

and she doesn't talk with her mom and . . . she appears at peace with that."

*Id.* at 51.

With respect to whether a parent-child bond exists between Mother and

Child, Ms. Webb testified as follows:

Q. [D]o you believe that [Child] has come to a place where she
understands that she may not be reunified with [M]other?

- 17 -

A. Yes.

Q. Does [Child] express any significant sadness about the lack of contact with [M]other?

A. No.

Q. Does she talk about missing [M]other?

A. No.

Q. Does she express a desire to want to be returned to [M]other's care?

A. No.

Q. So, based on your therapeutic work with [Child] at this point, how would you describe . . . her bond with [M]other, if it exists?

A. It would be hard for me to describe their bond . . . and that really tells me that I'm not sure a strong bond exists.

N.T., 10/15/19, at 50–51.  Ms. Webb clarified:

Q. [J]ust to be clear, again, do you believe there's a parent-child bond between [Child] and [M]other at this point?

A. Again, not that I can say.  I have not observed any of their interactions, and from what [Child] is talking about and processing in her current sessions, I'm not sure that a bond exists at this time.

Q. And do you believe there would be any irreparable harm to her if rights were terminated?

A. Not that I can say.

*Id.* at 53.  Ms. Webb testified that Child "is very stable in her current home[,] and she experiences a lot of support from her paternal great aunt . . . ." *Id.* at 52.

The testimony of Ms. Palmer and Ms. Webb overwhelmingly supports the termination of Mother's parental rights pursuant to Section 2511(b) insofar as they clearly and convincingly confirmed that termination will best serve Child's developmental, physical, and emotional needs and welfare. Accordingly, we affirm the order pursuant to 23 Pa.C.S. § 2511(a)(2) and (b).

Decree affirmed. Appeal at 3204 EDA 2019 quashed.


*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 5/1/2020*